In re Thomas Wesley HENDERSON, Ida Irene Henderson, Debtors.

Thomas W. HENDERSON, Plaintiff,

v.

ASHLAND FINANCE COMPANY, Defendant.

Thomas Wesley HENDERSON, Plaintiff,

v.

GRAYSON MOTOR SALES, INC., d/b/a Southern Diesel Equipment Co., Defendant.

Bankruptcy Nos. 79–00034 A, 79–00097 A.

United States Bankruptcy Court, W.D. Virginia, Abingdon Division.

Oct. 13, 1983.

---

James E. Nunley, C. Adrian White, Bristol, Va., for debtor-plaintiff.

Thomas C. Givens, Jr., Tazewell, Va., for Ashland Finance Co.

. John E. Kieffer, Bristol, Va., and W.H. Dysard, Ashland, Ky., for Grayson Motor Sales, Inc.

## MEMORANDUM OPINION

H. CLYDE PEARSON, Bankruptcy Judge.

This case arises under the Bankruptcy Act of 1898 and is governed by that Act.

Thomas Wesley Henderson and his wife, Ida Irene Henderson (hereafter debtors or Hendersons), filed petitions in this Court on February 1, 1979 and May 7, 1979, respectively. Mrs. Henderson's petition was filed under Chapter XIII. Mr. Henderson's case initially began as a Chapter XI, but was subsequently converted to Chapter XIII.

Among the creditors filing claims in these cases were Ashland Finance Company ("Ashland") and Grayson Motor Sales, Inc. ("Grayson"). Ashland filed a secured claim in the amount of $205,645.49, claiming security in real property owned by the Hendersons in Virginia. This claim arose from a loan made to the Hendersons for the purpose of purchasing mining equipment, consolidating some of their debts, and providing a small amount of operating capital for their mining business.

Grayson filed an unsecured claim in the sum of $30,099.52, representing a deficiency resulting from the liquidation of its collateral purchased by Henderson from Grayson Motor Sales and financed by Grayson Loan Company. Upon default, Grayson Loan recoursed the paper to Grayson Motor Sales for repossession and liquidation under the Uniform Commercial Code of Kentucky.

Pursuant to *Rule* 306(c), *Federal Rules of Bankruptcy Procedure*, the Hendersons filed complaints under *Rule* 701 (now 7001) objecting to the claims of both Ashland and Grayson and seeking affirmative recovery of damages against both creditors. The complaint alleges fraud, misrepresentation, usury, coercion, and breach of contract, as well as failure to comply with the *Uniform Commercial Code* in repossessing and liquidating the collateral upon which the creditors had security interests. The complaints allege that Ashland and Grayson are jointly liable to the debtors in that they acted in concert through their mutual officers, agents, and representatives to the prejudice of the debtors.

Ashland and Grayson generally deny the allegations and contend that the incidents complained of did not constitute concerted action, but were completely separate corporate transactions and dealings and were not related.

Upon motion of the Hendersons and after reviewing the pleadings, the Court, over objections of Ashland and Grayson, ordered the complaints consolidated for trial. The cases were thereupon tried and the evidence heard in the joint trial over a seven day period which, because of time and courtroom availability limitations, was conducted in three separate sessions during March, May, and June of 1982.

During the course of the trial, Ashland objected to the admission of the testimony of a witness, Ben Whitt. Ashland denied

that Whitt's testimony bound Ashland, as Whitt was solely the agent of Grayson. Ashland and Grayson, at the conclusion of Plaintiff's case, also moved to strike the Plaintiff's evidence and enter summary judgment in their behalf. The Court deferred judgment on said motions pending completion of all the evidence and, for the reasons hereafter stated, the objections and motions are overruled.

Excellent briefs were filed by counsel upon the issues presented, which are essentially as follows:

(1) Whether Ashland and Grayson, at the times alleged and appearing from the evidence, were acting in concert;

(2) Whether the claims of Ashland and Grayson should be allowed or disallowed for failure to comply with the *Uniform Commercial Code of Kentucky;* and,

(3) Whether the Hendersons are entitled to recover upon the counter-claim.

## FINDINGS OF FACT

Ashland Finance Company is a Kentucky corporation organized in 1958 by the late E.R. McGuire, father of the McGuire children who are present officers, directors, and shareholders, for the primary purpose of lending money. Ashland is the parent company of Ashland Finance of Kentucky, Ashland Industrial Loan of Kentucky, Ashland Finance of Virginia, Ashland Finance of West Virginia, and Ashland Finance of Ohio. Ashland and its subsidiaries are wholly owned by the late E.R. McGuire's sons, E.E. and L.R. McGuire, and daughters, Cleo and Helen McGuire, as individual shareholders or through their solely owned and controlled corporations.

Grayson Motor Sales, Inc. (which also traded as Southern Diesel and Equipment) is a Kentucky corporation engaged in the business of selling new and used motor vehicles, as well as buying, selling, and brokering heavy mining or construction equipment. According to a 1978 prospectus of Ashland Finance Company filed in evidence, the stock of Grayson is wholly owned by McGuire Motor Sales which, in turn, is wholly owned by the McGuire family. Grayson and McGuire Motors together own 35% of the capital stock of Ashland Finance Company. All of the corporate subsidiaries and companion companies are governed and controlled by the respective members of the McGuire family in various corporate capacities.

The following diagrams reflect, so far as is relevant and can be determined from the records, the various entities, their ownership and control as related to the issues herein:

**564**

Stock Ownership

OFFICERS AND MANAGEMENT

| | Officer | Director | Salary |
|---|---|---|---|
| **ASHLAND FINANCE COMPANY** | | | |
| E.E. McGuire | Exec. V.P. | X | X |
| L.R. McGuire | V.P. | X | X |
| E.R. McGuire | Pres. | X | |
| Cleo McGuire | | X | |
| Helen McGuire | | X | |
| | | | |
| **GRAYSON MOTOR SALES** | | | |
| E.E. McGuire | V.P. | X | ? |
| L.R. McGuire | Pres. | X | X |
| E.R. McGuire | V.P. | X | |
| Cleo McGuire | | X | |
| Helen McGuire | | X | |

OFFICERS AND MANAGEMENT

| MCGUIRE MOTORS | Officer | Director | Salary |
|---|---|---|---|
| E.E. McGuire | V.P. | X | |
| L.R. McGuire | V.P. | X | |
| E.R. McGuire | Pres. | X | |
| Cleo McGuire | | X | |
| Helen McGuire | | X | |

| GRAYSON LOAN COMPANY | | | |
|---|---|---|---|
| E.E. McGuire | V.P. | X | X |
| L.R. McGuire | Pres. | X | X |
| E.R. McGuire | V.P. | X | |
| Cleo McGuire | | X | |
| Helen McGuire | | X | |

| ASHLAND SUBSIDIARIES | | | |
|---|---|---|---|
| E.E. McGuire | X | X | |
| L.R. McGuire | X | X | |
| E.R. McGuire | X | X | |
| Cleo McGuire | | X | |
| Helen McGuire | | X | |

| DOCK'S CREEK RIVER TERMINAL | | | |
|---|---|---|---|
| E.E. McGuire | Pres. | | |

---

The Hendersons are Virginia residents, having lived in Washington and Russell counties for many years. Mr. Henderson had been involved in the coal industry since 1946 and was employed for a number of years by Clinchfield Coal Company prior to the events in question. While so employed, Henderson started a trucking company which hauled for Clinchfield and acquired a bulldozer and a 644B John Deere front-end loader. When the operation of the trucking company closed, Henderson used this equipment to start a strip mine business.

At the time of the events herein, Henderson was employed by Zoro Marcum in eastern Kentucky to face up and open a deep mine site. He was using the dozer and Deere loader from the defunct trucking company which, although smaller than equipment used in many stripping operations, apparently was adequate for that job.

In August of 1976, Henderson met an individual by the name of Ben Whitt in a restaurant in Middlesboro, Kentucky. During a discussion of the mining business, Henderson told Whitt of his acquisition of a coal lease with Keaton Coal and his plans for an enlarged strip mine operation after completion of the Zoro Marcum job. The Hendersons testified that Whitt represented that he was a machinery salesman for E.E. McGuire and Ashland Finance and could put together an "entire strip mine package" which would be suitable for Henderson's operations. Although the evidence was conflicting, the Court finds that the testimony of the Hendersons as corroborated by the other evidence and circumstances prevailing, accurately states the facts relating to that representation.

The evidence reflects that Whitt primarily was an employee of Grayson Motor Sales in the capacity of Sales Manager.

His duties entailed traveling throughout the coal mining areas buying, selling, and brokering heavy equipment for the benefit of Grayson, as well as Ashland. Additionally, Whitt would arrange financing for the machinery or equipment packages he put together. Whitt's compensation was in the nature of commissions on equipment sold. Although Whitt did not draw a salary from Ashland, he often sold equipment owned and repossessed by Ashland and performed additional services, such as collecting and servicing loans in behalf of Ashland for its customers throughout the coal fields of Kentucky.

The "strip mine package" discussed included a Gardner-Denver RD–16 drill, an International TD–25 dozer, and a 988 Caterpillar front-end loader. This equipment was substantially larger than Henderson's present equipment and would enable him to operate a much larger stripping business. Whitt told Henderson that the drill and dozer were presently in inventory and could be viewed on an equipment lot owned by one Otto Sams. Whitt further advised Henderson that he would have the package financed by Ashland Finance Company through E.E. McGuire, the Executive Vice-President and chief operating officer of Ashland.

Several weeks later, after viewing the drill and dozer, he and his wife again met with Whitt at the same restaurant in Middlesboro, Kentucky. Whitt indicated that he had spoken with E.E. McGuire of Ashland Finance about the financing of the mining equipment and that McGuire wanted to talk with the Hendersons about collateral. Whitt advised that he had not yet obtained the 988 Caterpillar loader traded for, but was expecting it shortly. According to Whitt, if the 988 loader was not available at the time Henderson closed on the drill and dozer purchase, the loader could be handled later as a separate transaction under the existing financial arrangement and that Henderson should get rid of the smaller 644 John Deere loader, as it would not be needed.

Based on the conversation with Whitt and the representations made as to the acquisition and financing of the spread of equipment, the Hendersons met E.E. McGuire at his office in Ashland, Kentucky shortly thereafter to discuss financing. E.E. McGuire, in behalf of Ashland, obtained the necessary financial information and a description of all collateral which the Hendersons could offer, including other machinery owned and real estate located in Virginia. E.E. McGuire subsequently flew to Virginia to inspect the Henderson realty which consisted of a farm, their home, and several other parcels.

Financing for the Hendersons was ultimately approved by Ashland and a loan was closed on October 25, 1976 in the principal amount of $144,585.00. This loan was secured by the mining equipment to be purchased, existing equipment owned by the Hendersons, and a first lien Deed of Trust on their real property in Virginia by refinancing other mortgages of Cumberland Capital. Disbursement was made by seven (7) checks, payable as follows:

(1) $8,000.00 to the Hendersons for operating expenses;

(2) $47,000.00 to the Hendersons and Cumberland Capital to pay off the existing mortgage against the real property;

(3) $5,000.00 to the Hendersons and Harry Johnson to pay off a purchase money loan on a DC–6 dozer owned by the Hendersons;

(4) $15,000.00 to the Hendersons and Grayson Motor Sales for the purchase of the RD–16 drill discussed hereafter;

(5) $65,000.00 to the Hendersons and Bank Josephine for purchase of the TD–25 dozer, also noted hereafter;

(6) $4,000.00 to the Hendersons and Ben Whitt, representing a 5% sales commission; and,

(7) $585.00 to the Hendersons and Ashland Finance to purchase credit life insurance.

Although the mortgage and DC–6 dozer notes were refinanced, Henderson testified that at the time he was having no difficulty whatever servicing his secured debt with his existing creditors and that McGuire proposed the entire financing package to conform to Whitt's plan and "strip mine package".

One note was signed by the Hendersons which provided for interest, closing costs, life insurance, late charges, attorney fees and court costs, if required. With the addition of these items to the principal financed, the documents reflect a total debt to Ashland of $201,182.76.

It was Henderson's understanding that the drill and dozer on Otto Sams' lot was owned by Ashland Finance Company, and it would finance his purchase. This assumption was incorrect. At the time, the drill was in fact owned by Otto Sams. The turntable (an essential component) was missing and the drill was, therefore, inoperative. Whitt assured Henderson he knew where Henderson could obtain a turntable which was undergoing repair for a cost of $800.00 to $1,200.00.[1] When Henderson expressed his interest in obtaining the drill, Whitt arranged for its purchase on behalf of Grayson Motors for the sum of $5,000.00. Whitt quoted to Henderson a price of $15,000.00, and this quotation was written up on a Grayson Motors order form. At closing, the $15,000.00 was disbursed by Ashland to the credit of Grayson Motors.

The TD–25 dozer parked at Sams' lot was quoted by Whitt to Henderson for the price of $65,000.00. Disbursement at closing was made in this amount to Bank Josephine (another McGuire family holding). The dozer, in fact, was not owned by The Bank Josephine. Ashland Finance had purchased the machine in its own name at a Bank Josephine foreclosure for $30,000.00.

The 988 Caterpillar loader that Whitt had promised to have included in the "spread" of equipment was apparently not available when the loan closed. Henderson continued to use the 644B John Deere loader he already owned, as it was adequate for the Zoro Marcum job. Shortly thereafter, Whitt advised Henderson that he should return the 644B loader to John Deere, as this would reduce the amount of monthly payments Henderson was then making. Relying on Whitt's promise that the larger 988 Caterpillar loader would be available within a short time, Henderson returned to John Deere the 644B loader. After a considerable lapse of time after Whitt failed to supply the 988, Henderson was forced to borrow a loader on a part-time basis from another strip mine operator and, finally, leased a loader to carry on his operations.

After repeated calls from Henderson regarding the availability of the 988 Caterpillar loader, Whitt told Henderson in January, 1977 to come to Grayson, Kentucky and inspect a loader that was available. On January 14, 1977, the Hendersons visited the Grayson Motors sales office, where they were told by Whitt that Grayson had a 120 Hough front-end loader for Henderson and that this was the only machine Grayson or Ashland could provide him, despite the fact that, according to Henderson's testimony, Grayson had four 988 Caterpillar loaders on the lot at this time. Henderson was reluctant to purchase the 120 Hough loader. It was not as large as the 988 promised and, therefore, did not have its loading capacity. The inspection of the 120 Hough was limited, as it was parked in a confined area. The inspection which was possible indicated serious mechanical problems: heavy smoke emanated from the machine when the motor was operating, diesel fuel was leaking into the crankcase, tires were worn, etc. When Henderson expressed his displeasure and reluctance to purchase this item, he was advised that the 120 Hough loader was the only loader available to him and that he could "take it or nothing". Whitt promised him the loader would be serviced and put in first-class condition. The price of this machine was $46,000.00. This price apparently was not mutually agreed upon by the parties.

1. It later appeared that the turntable described by Whitt was available at a cost of $4,000.00.

Grayson had just recently acquired the 120 Hough loader for the sum of $10,000.00.

Relying on the oral representations from Whitt that the loader would be reconditioned and being in desperate need of a loader, the Hendersons reluctantly agreed to purchase the machine. The loan documents were drawn up and signed in Grayson's office, which included a 3-day right of rescission by the purchaser. Prior to the expiration of the three day period, the Hendersons discovered that the 120 Hough was a 1969 model instead of a 1970 as had been represented, and that the actual interest charged varied from the rate quoted. As they were also dissatisfied with the size and type of equipment and its condition for the purposes needed, the Hendersons mailed a letter seeking rescission of the sales contract to Grayson Motors.

Several days thereafter, Henderson received a telephone call from Whitt, who informed Henderson in a threatening manner that if he rescinded the purchase of the 120 Hough loader, E.E. McGuire and Ashland Finance would sell out everything the Hendersons owned. Whitt directed Henderson to meet him at a restaurant on Interstate 75 in Kentucky by 6:00 a.m. the next morning with a document revoking his rescission notice and reciting that the Hendersons knew the 120 Hough was a 1969 model and not a 1970 model as represented by Grayson, and that the interest rate on the loan was known by Henderson to be 22% instead of the 16% quoted in the loan documents. Henderson testified that he felt he had no other choice and, not wanting to lose his home and farm, he thereafter executed the documents demanded by Whitt and traveled to the appointed location to deliver the papers to Whitt. These facts were denied generally by Whitt.

Henderson testified that neither he nor his wife read the loan documents dealing with the purchase of the 120 Hough loader because they were rushed through the closing by Grayson personnel. An examination of the purchase order indicates that a second lien Deed of Trust on the Hendersons' real property was to be given as additional collateral for the loan. The same was never consummated, although attorney's fees of $250.00 and a $50.00 recording fee for a Deed of Trust were added to the contract price of the loader. In addition, "closing costs" of $800.00 were noted in the document. It appeared later in testimony that this represented transportation charges for delivery of the loader to Henderson's mining site.

The verbal promises to repair the loader made by Whitt on behalf of Grayson Motors to induce its purchase were not carried out. Numerous contacts were made with Whitt about the repairs, but without success. When Henderson complained to E.E. McGuire that the repairs and reconditioning promised by Whitt had not been performed, McGuire responded, "if Ben said it would be done, it will be done."

The loader never performed satisfactorily. The evidence reflects that the party who sold the loader to Grayson had fully advised the Grayson personnel of the poor condition of the loader and put Grayson on notice of existing defects. The poor condition of the loader resulted in loss of power to lift and load. This caused substantial delays and expense to Henderson's mining operations.

After the Zoro Marcum job, Henderson moved his operation to the "Pathfork" site. The 120 Hough loader became totally inoperable while on this job and was described as "locked up". Because of the loader's condition, Henderson was not able to produce the minimum coal output required under his contract, as a result of which his lease was terminated by the lessor. Henderson vacated the Pathfork site, taking the drill and TD–25 dozer. The disabled 120 Hough loader remained on site.

Henderson moved to Mt. Vernon, Kentucky. He was able to acquire a small 644B John Deere loader from Tri-State Equipment with which to operate. He could not afford a larger loader, as all his assets were pledged and encumbered by Ashland. For a brief period, he leased the three pieces of machinery to third parties to clear a motel site in Mt. Vernon. This

venture worked satisfactorily for a short time until the turntable on the drill was repossessed by Otto Sams for nonpayment of the $4,000.00 repair bill which Whitt agreed to take care of.

Henderson, who had machinery but no leases, agreed to form a partnership with one Smiley to mine his (Smiley's) leases. Henderson and Smiley met with E.E. McGuire to discuss this tentative arrangement, following which Smiley agreed to act as guarantor on Henderson's loan to Ashland and to furnish additional collateral. The venture was approved by McGuire for Ashland. Smiley gave liens upon his real estate and equipment as additional collateral for the Henderson loan. In return, E.E. McGuire promised to extend the payment due date on the Henderson loan for 30 days, to replace the repossessed drill turntable, and to have the 120 Hough loader repaired and deliver it to Mt. Vernon. Smiley and Henderson also assigned 70% of the coal proceeds derived from Mt. Vernon to Ashland.

Ashland did, in fact, pay the repair bill on the drill turntable, and Smiley was, able to restore the drill to operating condition. Henderson and Smiley were advised that Grayson had ordered parts to repair the 120 Hough loader and if they did not arrive soon, Grayson would lend a loader on a temporary basis. The evidence reflects that the loader was never repaired nor a replacement provided.

The evidence further shows that without the proper equipment, Henderson and Smiley were unable to produce and deliver sufficient coal to maintain payments on the Ashland and Grayson loans. As a result, Ashland advised Henderson and Smiley on December 7, 1977 that the collateral was being repossessed. Ashland engaged one Lester Dugger ("Dugger") to repossess the drill, dozer, and other equipment and store these on a lot he owned in the nearby town of Corbin, Kentucky.

Smiley's real estate in Tennessee was thereafter sold at foreclosure, as well as the pledged personal property.

The evidence reflected that the TD–25 dozer was in good repair when repossessed, but was stripped of parts while on Dugger's lot in Corbin, Kentucky. This substantially reduced its resale value. The dozer was later moved to the Grayson's lot. Ashland thereafter, without any advertising or public sale effort, sold the dozer in a private sale to Dock's Creek River Terminal for $20,000.00. E.E. McGuire was president of and owned 75% of the stock of this West Virginia company.

The RD–16 drill was moved from Dugger's lot to Grayson Motors. Shortly thereafter, it was leased out for about a year to third parties. The evidence does not reflect any accounting for rental income. The drill was never advertised or sold at public auction. In September, 1978, nine months after repossession, Ashland gave Henderson a credit upon his account of $15,000.00 for the drill. After substantial repairs were charged to Henderson, the drill was sold for $32,000.00 to McGuire Motors. In October, 1980, Grayson sold the same drill for $32,000.00 to third parties.

The D–6 dozer was never accounted for, and a 1972 GMC truck and a 1965 International truck owned by Henderson were sold by E.E. McGuire for $750.00 without any showing as to advertising or manner of sale.

The evidence showed that Henderson and Smiley had stockpiled approximately 2,500 tons of coal at the Mt. Vernon site when the equipment and stockpile were repossessed. Smiley testified that he had been offered $38.00 per ton as a pit price. As a result of the assignment made by Henderson and Smiley, Ashland owned 70% of the stockpiled coal. No evidence was presented upon trial by Ashland or Grayson as to the disposition of the stockpile in which debtor retained a 30% interest. 2,500 tons at $38.00 per ton would have totaled $95,000.00, 30% of which amounts to $28,500.00, leaving a credit upon Henderson's account of $66,500.00.

Following the repossession, E.E. McGuire, on behalf of Ashland, obtained as

additional collateral another assignment of a coal lease Henderson had obtained on what was referred to as the Eblin site at Mt. Vernon. The evidence does not reflect a value of this lease, nor does the evidence reflect the disposition of the lease by Ashland.

In the disposition of the 120 Hough loader, notices of public sale were posted on December 6, 1977 in the windows of Grayson Loan, Grayson Motors, and First National Bank in Grayson. Handbills were posted at the courthouse in Carter County, Kentucky. There was no evidence of any advertising of the impending sale of this equipment in trade journals, newspapers, or other outside sources in order to give notice to the public generally. Notice was sent to the Hendersons by certified mail, although the Hendersons testified that they did not receive such notice. The sale was held at Grayson Motors on December 20, 1977. It was attended by four or five persons. Grayson Motors, t/a Southern Diesel, bid in the loader for $15,200.00 and later sold it for $53,000.00 to third parties.

The Court first concludes that Ashland and Grayson failed to comply with the *Uniform Commercial Code of Kentucky* in the repossession and liquidation of the collateral.

■ The transaction in question deals primarily with Kentucky law. The burden of proof under Kentucky law as to the repossession and disposition of collateral in a commercially reasonable manner rests upon the secured party. KRS § 355.9–504(3) states:

"Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition* including the method, manner, time, place and terms must be *commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type

*customarily sold on a recognized market,* reasonable notification of the time and place of any public sale or *reasonable notification of the time after which any private sale* or other intended disposition is to be made shall be sent by the secured party to the debtor, .... (Emphasis added)"

The leading Kentucky case on commercially reasonable disposition of collateral is *The Bank Josephine v. Conn,* 599 S.W.2d 773, 28 UCC Rep.Ser. 1226 (Ky.App.1980). In that case, the Court held that failure to comply with UCC requirements governing the disposition of collateral is an absolute bar to recovery of a deficiency judgment.[2]

The Kentucky court, considering the issue as one of first impression in the jurisdiction, held that the secured party, rather than the debtor, should have the burden of proving that it has acted with commercial reasonableness.

In any transaction involving the holding and subsequent sale of collateral, the secured party is in the best position to introduce evidence that it acted in accordance with reasonable commercial standards. The secured party, rather than the debtor, knows when it sent notice to the debtor of a public or private sale, and how that sale was advertised, if at all. *The Bank Josephine v. Conn, supra,* 599 S.W.2d at 774, 28 UCC Rep.Ser. at 1228.

The facts in *The Bank Josephine* case reflect that the secured party did not safeguard the collateral (two coal trucks) as required by KRS § 355.9–504(3). The collateral was not disposed of until some 4–5 weeks after repossession, thereby substantially and materially reducing its value. The secured party further failed to introduce any substantial evidence as to how the sale was noticed or advertised to the public. 599 S.W.2d at page 775, 28 UCC Rep.Ser. at page 1229, the Court stated:

"There was no material evidence as to where the notice of the sale was placed,

---

**2.** Cited for this proposition in 10 ALR 4th 413 (1981). The Kentucky court reached the same conclusion as did the court in the case of *In re Bishop,* 482 F.2d 381 (4th Cir.1973).

or if the sale had been advertised in any newspaper or circular."

Furthermore, the evidence established that the secured party was the only bidder at the sale. On the basis of this evidence and the fact that the collateral was sold for an amount greater than that bid by the secured party shortly after the initial sale, the presumption arises that the sale was not conducted with commercial reasonableness. The Kentucky court held that the secured party failed to act with commercial reasonableness and was, therefore, estopped and denied a deficiency judgment against the debtors.

■ The facts in the Henderson case are remarkably similar. The TD–25 dozer repossessed by Ashland was stripped of parts while being stored on the premises of Lester Dugger, Ashland's agent, and that Smiley's 1970 International road tractor was wrecked during the period between repossession and resale. The value of both the tractor and the dozer was substantially and materially reduced after repossession.

Likewise, Ashland and Grayson failed to introduce material evidence as to adequate posting of notices of sale of the equipment, and there was no showing that the sale was advertised in a newspaper, circular, or trade journal from which the public generally would obtain notice.

■ Ashland failed to give the Hendersons written notice of private sales of the drill and dozer as required by KRS § 355.-9–504(3). The mere fact that the debtor knew that the collateral would be sold eventually was not sufficient notice. *Nelson v. Monarch Investment Plan of Henderson, Inc.*, 452 S.W.2d 375, 7 UCC Rep. Ser. 394 (Ky.App.1970); *see* Harris, "Defending Deficiency Judgment Suits in Kentucky: Article Nine, Part 5 of the Uniform Commercial Code", 61 *Ky.L.J.* 578 (1973).

Lastly, as in the case of *The Bank Josephine v. Conn,* the secured party (Ashland, Grayson, or a companion McGuire corporation) appeared to be the sole bidder at the sales of the collateral, private or public. The collateral was purchased by the secured party for a sum much lower than the amount owed on it and was resold to third parties shortly thereafter for a much larger sum. The drill was leased for approximately a year without any accounting for such income to debtors.

In each of the instances involving the equipment, the variances between the liquidating price and later sale price was striking. The 120 Hough loader was originally taken into Grayson's inventory at a price of $10,000.00, and sold to the Hendersons for $46,000.00. The drill was purchased by Grayson for $5,000.00, sold to Henderson for $15,000.00 and, after repossession and one year lease period, was subsequently resold for $32,000.00. The TD–25 dozer was originally taken into Ashland's inventory at $30,000.00, sold to Henderson for $65,000.00 and, thereafter, repossessed, stripped, and later resold at a private sale to one of E.E. McGuire's companies for $20,000.00.

§ 9–504(3) of the *Uniform Commercial Code* requires the creditor to give reasonable notification to the debtor and then proceed in a commercially reasonable manner to dispose of the collateral. In such disposition of the collateral, it may be by public or private sale, but every aspect of the disposition, including the method, manner, time, place, and terms, must be commercially reasonable.

A public sale has been defined as follows:

"... term 'public sale' demands notice to sufficient number of people to insure fairness of sale and competitive bidding." See *Standley v. Knapp*, 298 P. 109, 112, 113 Cal.App. 91 (1931).

The sales in question were virtually without public advertisement and, as such, were totally inadequate to give notice of a "public sale" of this valuable and expensive heavy equipment. The evidence fails to reflect any advertisement other than some perfunctory form of notice placed in isolated windows of the creditor and one or two other offices. With respect to the lack of public advertising, even in a local newspaper, the Kentucky court in *The Bank Jo-*

*sephine, supra,* 599 S.W.2d at 775, 28 UCC Rep.Ser. at 1229 stated:

"... the appellant failed to introduce any substantial evidence as to how the sale of February 22 was noticed or advertised to the public. There was no material evidence as to where the notices of the sale were placed, or if the sale had been advertised in any newspaper or circular. Furthermore, the evidence established that the appellant was the only bidder at the sale. Given this evidence—or lack of evidence—it is fair to say that the appellant failed to establish it acted with commercial reasonableness in selling the collateral involved. Cf. *Farmers Equipment Co. [v. Miller ], supra.* [ (252 Ark. 1092) 482 S.W.2d 805, 11 UCC Rep.Ser. 388 (Ark.1972) ]. And as is argued by the appellees, the fact that the collateral was sold for $15,000.00 shortly after the initial sale raises the presumption that the sale was not conducted with commercial reasonableness."

Cf. KRS § 355.9–507(2); also, see Harris, "Defending Deficiency Judgment Suits in Kentucky: Article Nine, Part 5 of the Uniform Commercial Code", 61 *KLJ* 578, 586 (1973).

The court went on to state:

"... we believe the record clearly establishes that the appellant failed to act with commercial reasonableness and, therefore, was estopped from securing a deficiency judgment against the appellees."

Hence, the Kentucky court has agreed with the rule that failure to comply with the Uniform Commercial Code in the disposition of collateral in a commercially reasonable manner deprives that creditor of a deficiency. *See* in accord *In re Bishop,* 482 F.2d 381 (4th Cir.1973).

The collateral repossessed and liquidated involved not only the drill, dozer, and loader, but other collateral pledged by the Hendersons to secure the loan. These were disposed of not only by questionable methods as to their commercial aspects, but were bid in and purchased by the creditor or sold, as in the case of the dozer, to another company controlled and owned by the parties who control and own Ashland and Grayson.

The loan by Ashland was a single note secured by the Hendersons' existing collateral Deeds of Trust on their real estate, plus the items purchased, such as the drill and dozer. There is no credible evidence as to the manner in which other collateral securing the loan was disposed of in a commercially reasonable manner. The burden of proof is, of course, upon the creditors to affirmatively prove compliance with the Uniform Commercial Code provisions. The additional collateral securing the loan to Ashland was a 70% interest in 2,500 tons of coal, which had a value of approximately $66,500.00. In the deficiency claim asserted, there is no accounting as to the proceeds from this coal or disposition of other coal leases which Henderson assigned to Ashland as additional collateral. It would appear to be a reasonable assumption that if all of the collateral representing equipment had been properly disposed of with appropriate advertisement and sale, along with the proceeds from the 2,500 tons of coal at Mt. Vernon totalling $66,500.00, that a deficiency would cease to exist in favor of either Ashland or Grayson. For that reason, neither Ashland nor Grayson are entitled to a deficiency. This case arising under the Bankruptcy Act of 1898, the disposition of this case and affirmative counterclaim is in accordance with the decision of *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). *See* also 4 *Collier on Bankruptcy,* § 68.20 (14th ed.).

The Hendersons additionally alleged, among the various causes of action, violation of usury statutes and, further, that Ashland was not properly chartered and without authority under the laws of Kentucky to make the loan in question. As to these contentions, the record and evidence presented is insufficient and inadequate to enable the Court to pass on these questions and, accordingly, in view of the decision herein, the Court declines to deal with these issues.

The Court further concludes that Whitt was at all times acting as agent for Ashland and Grayson in the sales and financing of the equipment. It is further concluded that in the sales transactions of the equipment package and the financing, that Whitt and E.E. McGuire were acting as agents of Ashland and Grayson in a concerted fashion, which actions were binding upon both parties.

The Court concludes that the evidence of Whitt's employment with Grayson for servicing of financing arrangements and debts of Ashland throughout the coal industry of southeastern Kentucky was in his capacity as properly authorized agent during the times in question.

■ The Court further concludes that Ashland and Grayson agreed to provide the package and financing of a good and sufficient Caterpillar 988 loader; that the failure to do so was a material breach of the contract and undertaking promised by Whitt upon which the financing arrangements were made; that pursuant to the contract, the note was executed, the collateral was pledged, and the Deed of Trust liens executed and placed upon the real estate of the Hendersons. The Court further concludes that the manner in which Ashland, Grayson, and their agents dictated the replacement and substitution of an obviously inferior loader, the Hough 120, was contrary to the free and voluntary consent of the Hendersons; that the acquisition of the Hough 120 and Henderson's efforts to rescind the purchase thwarted by the intervention of Whitt was due to the economic pressure, duress, and coercion which prevailed.

The question of duress has recently been dealt with in this jurisdiction. Generally, duress may be said to exist whenever one party exerts pressure on another which induces the other to enter a contract or otherwise act under circumstances which deprive the person pressured of the exercise of free will. *See Azalea Drive-in Theatre, Inc., etc. v. Sargoy, et al.,* 394 F.Supp. 568 (E.D.Va.1975). *See* also 25 *Am.Jur.2d,* "Duress and Undue Influ-

ence", § 1 (1966); 17 *CJS,* "Contracts", § 168 (1963); *Restatement of Law of Contracts* § 492.

In *Azalea, supra,* at page 574, the Court stated:

While the language used to define duress differs from jurisdiction to jurisdiction, "underlying all definitions of 'duress' is the dual concept of external pressure and internal surrender, or loss of volition in response to outside compulsion."

17 *CJS, supra,* at 943.

The evidence here clearly reflects that the Hendersons, following the execution of the loan which encumbered all of their assets, had little or no means of voluntary action. This was true whether related to the acceptance of the 120 Hough loader contrary to their contract, or to the later efforts to rescind that purchase contract. The Court finds that there was a breach of contract and the coercive action on the part of Ashland and Grayson was alone sufficient to deny any deficiency asserted by either of the creditors.

■ The Hendersons, by their counterclaim, seek an affirmative recovery. The difficulty with the counterclaim is the lack of credible evidence in the record to establish with sufficient certainty the nature and amount of damages. The Hendersons' damage claims for loss of coal leases and future profits were somewhat speculative. The only damages established with a sufficient degree of certainty came from the uncontradicted testimony of Mr. Smiley and concerned the coal remaining at Mt. Vernon which Ashland and Grayson took over, seized, and apparently disposed of when the repossession of the equipment occurred. Henderson owned a 30% interest in the 2,500 tons of stockpiled coal valued at $95,000.00; his interest, therefore, amounted to $28,500.00. For this sum, judgment will be entered.

Accordingly, an Order will be entered denying any deficiency to Ashland or Grayson, and awarding an affirmative judgment against Ashland and Grayson in the sum of

$28,500.00, representing Henderson's 30% interest in the 2,500 tons of coal herein referred to.

Service of a copy of this Memorandum Opinion shall be by mail to all Counsel of Record, the Debtors, and the Trustee.

